Counsel for the defendants may submit an appropriate Order pursuant to *R.* 4:42–1.

LILLIAN M. TRAINOR, RAY VRANICH, FRANK CAULFIELD, JEANNINE GENDER AND PAUL STEPHENSON, PLAINTIFFS, v. BURLINGTON COUNTY BOARD OF CHOSEN FREEHOLDERS, JOHN SACCA, SUPERINTENDENT OF ELECTIONS, AND BURLINGTON COUNTY BOARD OF ELECTIONS, DEFENDANTS.

Superior Court of New Jersey
Law Division Burlington County

Decided October 15, 1984.

290

*John E. Harrington* for plaintiffs Trainor, Vranich, Caulfield and Gender (*Schlesinger, Schlosser, Foy & Harrington,* attorneys).

*Ronald E. Bookbinder* for plaintiff Stephenson (*Bookbinder & Guests* attorneys).

*Michael J. Hogan,* Burlington County Solicitor for Board of Chosen Freeholders.

*John M. Carbone* for defendant John Sacca (*Carbone and Faase,* attorneys).

*John L. Madden* for David Norcross and Arthur Rago, Members of defendant Burlington County Board of Elections.

*Kenneth M. Olex,* Dep. Atty. Gen. (*Irwin Kimmelman,* Atty. Gen. of N.J., intervenor).

HAINES, A.J.S.C.

The Burlington County Board of Chosen Freeholders created the Office of Superintendent of Elections on May 23, 1984. The defendant, John Sacca, was appointed to that office on August 8, 1984, by a Board resolution which provided in pertinent part as follows:

> FURTHER RESOLVED pursuant to *N.J.S.A.* 19:32–50 all appropriations made in the budget of the County Board of Elections except those made for the payment of the salaries of the members of the Board of Elections shall be transferred and made available to the Superintendent of Elections for the carrying out of his powers and functions vested in him under the statutes, which shall include appropriations for salaries and wages, control and conduct of permanent registration, and custody, maintenance and distribution of voting machines.[1]

He thereupon seized control of the Board of Elections' offices and all of its furniture, equipment, files, and employees. He changed the locks on the doors of the offices and refused to

---

[1]The resolution was defective in that it provided only for the salaries of members of the Board of Elections and not for its "expenses" as required by *N.J.S.A.* 19:32–50.

give keys to members of the Board.[2] This suit, brought by two Democrat members of the Board of Elections and three Democrat candidates for office in the November 1984 election, seeks restraints against the various actions of the Board of Freeholders and the Superintendent together with other appropriate relief. Earlier negotiations designed to resolve the issues by agreement have failed.

The Board of Freeholders, recognizing its obligation to provide some resources for the operation of the Board of Elections, takes the position that it cannot make an appropriate allocation of money, employees, office space, furniture and equipment until the Board of Elections has certified its needs to the Board of Freeholders. The Board of Elections, however, cannot provide a certification. It is deadlocked. That Board is composed of two Democrats and two Republicans who cannot agree upon an appropriate allocation. Indeed, it has been unable to employ counsel in connection with this proceeding and is an unrepresented defendant.

The Attorney General appeared initially for the Superintendent of Elections. However, he also represents the Board of Elections. As a consequence, he withdrew from representation of either of these offices, recognizing a conflict of interest. He was permitted, nevertheless, to intervene on his own behalf "in order to address any issue which relates to, or affects, the proper administration of the election statutes of the State of New Jersey and the conduct of elections to be held in Burlington County."

There is no serious dispute concerning the validity of the creation of the Office of Superintendent of Elections by the Board of Freeholders or the validity of the appointment of John Sacca as Superintendent. The court holds that these actions

---

[2]He was entitled only to possession of records, equipment, etc., relating to voting machines and voter registration. *N.J.S.A.* 19:32–53. Nevertheless, he took everything, including records and equipment relating solely to the functions of the Board of Elections.

were proper. The issues, therefore, involve the allocation of resources between the Board of Elections and the Superintendent of Elections and the procedures to be followed in making that allocation.

## A. *The Deadlocked Board of Elections*

■ The Board of Elections has been unable to act as a Board in connection with this controversy because of the differences of opinion between the Democrat and Republican members. It has not been able to adopt any position with respect to the allocation of resources or to select an attorney to appear on its behalf in the present litigation. The within complaint was filed on August 30, 1984. The matter was argued on that date and postponed to September 7, 1984, for further argument. Meanwhile, the members of the Board of Elections were instructed to continue negotiations in an effort to resolve their disputes. All parties were advised that the court would consider the appointment of a receiver for the Board of Elections on that date in the event the matter was not resolved by agreement. Argument concerning the proposed appointment was invited.

On September 7, 1984, the court was advised that no agreement had been reached. Plaintiffs supported and defendants opposed the proposed appointment. Some parties requested further time for negotiation. The court decided that a master, not a receiver, should be appointed to carry out the functions of the Board of Elections with respect to the allocation of resources between the Board and the Superintendent. The appointment was delayed, however, until September 14, 1984, in order to provide one more week within which opportunities for agreement could be explored.

The delay produced no change and, on September 14, 1984, the court therefore appointed the Public Advocate as master to:

(a) Prepare a position paper setting forth the needs of the Board of Elections for the remainder of its fiscal year, recognizing, in doing so, the needs of the

Superintendent of Elections and to present that paper to the Board of Freehold-
ers not later than October 15, 1984.

(b) Meet with the parties for the purpose of negotiating a solution to the
disputes.

(c) Present to this court the position of the Board of Elections as to the
responsibilities of that Board following the appointment of the Superintendent.

The appointment of a master is authorized by *R.* 4:41–1,
which provides in part as follows:

> The reference for the hearing in the matter by judge of the Superior Court
> shall be made to a master only upon approval by the Chief Justice, except
> where the reference is for the taking of the deposition, or as to matters heard
> by a standing master appointed pursuant to *R.* 1:34–1, or under extraordinary
> circumstances.

The circumstances in which the Board of Elections finds itself
in this case are deemed to be "extraordinary." Nevertheless,
the approval of the Chief Justice was obtained.

Case law also supports the appointment. In *So. Burlington
Cty, N.A.A.C.P. v. Mt. Laurel Tp.,* 92 *N.J.* 158 (1983), the court
authorized the appointment of special masters to assist munici-
pal officials in the development of land use regulations. In this
connection, the court said:

> This form of supervision is neither as intrusive nor as novel as it might seem.
> It is not overly intrusive since the municipality itself develops the ordinance
> with the advice and assistance of the special master and the participation of the
> other parties. The final result, of course, is subject to the trial court's
> approval. Nor is it especially novel. In addition to the increasing use of special
> masters in the implementation of remedies in institutional litigation, courts
> necessarily intrude into parties' affairs in all litigation—that is the very nature
> of a lawsuit and its consequences. Such intrusions have traditionally taken the
> form of supervising a party's business, whether as a result of bankruptcy,
> probate, or corporate litigation; compelling parties to appear as witnesses to
> testify, which may entail considerable disruption of those persons' lives and
> affairs; creating special tribunals; and in many other ways becoming involved
> itself with the lives and activities of the parties. We have however become
> accustomed to seeing courts and their delegates function in those 'traditional'
> roles and therefore do not object to their activities, while the use of special
> masters is a relatively new remedial device. [*Id.* at 283–84.]

In the *Petition of Battle,* 96 *N.J.* 63 (1984), the Supreme Court
directed an assignment judge to appoint a master, subject to
the approval of the Chief Justice, to supervise the taking of
depositions of certain nursing home residents concerning their

challenged absentee ballots. In *Nero v. Bd. of Chosen Free-holders, Camden Cty.* 144 *N.J.Super.* 313 (1976), the court considered an application to restrain the defendant, Board of Freeholders, from proceeding with certain hearings on the ground that the Board was biased and could not afford plaintiffs a fair hearing. The Appellate Division remanded the matter for a hearing on the question of bias and said:

> should the trial judge find that a quorum does not exist which is qualified to hear the issues, it would be appropriate for the trial judge to consider reference to a master for hearing of the charges, pursuant to *R.* 4:41–1 *et seq.,* with the direction to the master to make findings of fact and conclusions of law and file his report directly with the trial court. [*Id.* at 324–325.]

The appointment of the master followed the imposition of restraints that restored the control of all functions relating to elections in Burlington County to the Board of Elections, which was advised to discharge election duties as though the Office of Superintendent of Elections did not exist. The restraints were deemed necessary to protect the public interest. They were imposed on September 7, 1984, in the teeth of a special election to be held on September 11. The dispute over authority and resources threatened the security of the election procedures and the validity of the election itself. No claim was made by any party that the Board of Elections had not functioned ably and responsibly in the past. It has performed all functions relating to elections, including those to be transferred to the Superintendent of Elections, for many years, and there is no reason that it should not continue with those responsibilities until present disputes are resolved. The appointment of the master followed the imposition of these restraints and was further a step designed to protect the public interest. The inability of the Board of Elections to take any position as a Board with respect to its need for resources and the proper allocation of duties between it and the Superintendent could not be permitted to continue. The only solution was to appoint an officer of the court to act on its behalf. The members of the Board of Elections remained free to resolve the current disputes at any time by agreement and were encouraged to do so.

## B. The Obligation of the Board of Freeholders to the Board of Elections and the Superintendent of Elections

█ The Board of Elections is a statutory body, established by the Legislature pursuant to the provisions of *N.J.S.A.* 19:6–17 to 25, inclusive. It consists of four persons, two of whom must be members of the political party receiving the largest number of votes cast for the general assembly at the last preceeding general election and two from the party receiving the next largest number of such votes. Thus, the setting for a deadlock is provided when political accommodations cannot be achieved. The Office of Superintendent of Elections is also statutory, created by *N.J.S.A.* 19:32–26. Separate, independent duties are assigned to the Board and the Superintendent. Both offices are autonomous, thereby responding to the public interest in preserving the integrity of the election process.

It is clear that the Board of Freeholders must provide for the needs of the Board of Elections. *N.J.S.A.* 19:6–21 provides in part:

> The county board shall be provided by the board of chosen freeholders of the respective counties with a suitable office or offices, furniture and such other equipment as the county boards deem necessary.

*N.J.S.A.* 19:45–4 provides in part:

> All costs, charges and expenses incurred by the ... county board ... in carrying out the provisions of this title [Title 19] and the salaries of the members of the county board ..., salaries and compensation for extra service of the clerk and other employees of the county board ... shall be paid by the county upon certification by the ... county board....

The Board of Freeholders has the same obligation with respect to the Superintendent of Elections. *N.J.S.A.* 19:32–27 provides:

> Each superintendent may appoint a chief deputy, a clerk, a secretary and any other assistants he considers necessary to carry out the provisions of this Title [19], and may remove the same whenever he deems necessary.... Each superintendent shall fix the salaries of the persons so appointed and such salaries certified to and approved under his hand shall be paid semi-monthly by the county treasurer of the county of which such persons are so engaged. All other necessary expenses incurred in carrying out the provisions of this Title when certified to and approved by the superintendent shall be paid by the

county treasurer of the county in which the superintendent shall maintain his office.

*N.J.S.A.* 19:32–29 provides:

> The board of chosen freeholders of such counties shall provide suitable room or rooms for the transaction of the business of such superintendent and procure suitable furniture therefore and any books, stationery, fuel, and supplies that may be necessary from time to time. It shall provide a proper place for the safekeeping of the records and papers.

*N.J.S.A.* 19:32–43 also requires the county to pay the expenses of the superintendent incurred in connection with the service, mailing and advertising of notices of proposed orders requiring district election boards to deny certain persons the right to vote.

These provisions, relating to the needs of the Board of Elections and the Superintendent of Elections are not discretionary—they are mandatory. The Board of Freeholders, therefore, cannot refuse to provide resources to either office.

### C. *Funding Procedures*

■ The Board of Freeholders argues that the transfer of all monies budgeted for the Board of Elections, except for the salaries of its members, to the superintendent, as well as the transfer of its furniture, equipment, files, supplies, and office space is automatic under the statutes. It indicates that it will supply resources to the Board of Elections once that Board has provided a certification of its needs. The argument relies upon *N.J.S.A.* 19:32–50 to 53 inclusive. Those statutory provisions are as follows:

> § 50 *Salaries and expenses during fiscal year in which act takes effect*
>
> If during the fiscal year in which this act becomes effective, the board of chosen freeholders of the county shall not have made provision in its annual budget for the payment of the salaries and other expenses of the superintendent of elections and his office during such fiscal year, all appropriations made in said budget to the county board of elections, except those made for the payment of the salaries of the members of said board and the expenses of the board in connection with the functions to be performed by it during said year, notwithstanding the provisions of this act, shall be transferred and made available to the superintendent of elections for the carrying out of the powers and functions vested in him under this act, which shall include all appropriations for (a)

salaries and wages, except for the salaries of the members of the board (b) the control and conduct of permanent registration, and (c) the custody, maintenance and distribution of voting machines.

§ 51 *Transfer of employees of county board of elections*

All employees of the county board of elections of the county hereby are transferred to the office of superintendent of elections but the board of chosen freeholders may provide two clerks for the county board of elections and fix the salary to be paid to such clerks.

§ 52 *Appropriations for salaries and expenses*

In the event that said appropriations shall not be sufficient to provide full payment of the salaries and other expenses of the superintendent of elections and his office and of the county board of elections and its office, during such fiscal year, the board of chosen freeholders shall appropriate and use any county funds, not otherwise appropriated or dedicated, for such purposes.

§ 53 *Voting machines, forms, records, etc., to be turned over*

Upon the taking effect of such resolution the county board of elections of the county shall turn over to the superintendent of elections all voting machines of the county with the keys thereto, and all records, books, binders, folders, files, card indexes, documents and forms, used or unused, relating to or used or useful in connection with the registration of voters, or the use of voting machines, in the county, together with all racks, cabinets, furniture, equipment and supplies used or useful for the filing, storing, repair servicing or use of the same.

The plaintiffs, relying on the statutory language, claim that paragraphs 50 and 52, both of which were part of *L.* 1947, c. 167, were effective only "during the fiscal year in which this act" became effective, namely, during 1947. The Freeholders read that language differently. They say that the act, properly interpreted, becomes "effective" when a particular county decides to create the Office of Superintendent of Elections so that its provisions are operative, not only in 1947 when the act was adopted, but in later years as well. The issue has not been decided in any reported case, and no legislative history is available. Compelling reasons, however, favor the plaintiffs' construction of the act:

(1) The language in question appears first at the beginning of Section 50 and reads: "If during the fiscal year in which this act becomes effective, the board of chosen freeholders of the county shall have not made provision in its annual budget for the payment of the salaries and other expenses of the superintendent of elections and his office during such fiscal year...."

This is clear language; it may not be subjected to interpretation. *Watt v. Bor. of Franklin,* 21 *N.J.* 274 (1956). It authorizes a transfer of appropriations during *1947,* the "fiscal year in which this act becomes effective." This reading is reinforced by the reference to the "annual budget" for the payment of the superintendent's expenses "during such fiscal year." Again, application of the act in this respect is limited to the 1947 budget. Section 50 also refers to expenses of the Board of Election "in connection with the functions to be performed by it during said year," referring, logically, to 1947. Finally, Section 52 permits the use of county funds other than those appropriated for the board of elections to cover the expenses of both superintendent and board "during such fiscal year." Section 52 is a part of the same act as Section 50. Sensibly read, it limits the use of other county funds to the year 1947 and the words "such fiscal year" refer back to the "fiscal year" to which Section 50 refers, *indicating the intention to limit, not only the unusual authority to transfer appropriations in the middle of the year but also the unusual authority to use other county funds at such time as the new office is created.* The Freeholders' effort to reach a contrary conclusion by interpretation strains the language, taking it entirely out of context.

(2) The *Laws of 1947,* Chapter 167, of which Sections 50 through 53 are a part, provides: "This act shall take effect immediately." The act was approved May 20, 1947. It is unreasonable to argue that the words in Section 50, "the fiscal year in which this act becomes effective" and the words "this act shall take effect immediately" have any different meaning than the language which makes this act "effective" in 1947. Reasonably, both references are to the same year—1947. Had the Legislature intended otherwise, it could have said in Section 50: "if during the fiscal year in which the freeholders established the office of the superintendent...."

(3) If, as argued by the Freeholders, the language of Section 50 were to be read as meaning any year in which a county establishes the office of superintendent of elections, then the

entire law would become effective only in that year. This would lead to the absurd result that the law only becomes effective when the county acts but that the county cannot act until the law *becomes* effective. Statutes are not to be construed in a way which leads to an absurd result. *Marranca v. Harbo*, 41 *N.J.* 569 (1964).

(4) In 1947, the fiscal year for counties coincided with the calendar year. *See L.1918* C. 238, § 2 (now *N.J.S.A.* 40A:5–3). Thus, since the act permitting the establishment of the office of superintendent of elections became effective May 20, 1947, the Legislature knew that it could not be employed by a county until after budgets had been adopted. A special provision concerning appropriations for that year was therefore a necessity. After 1947, counties would be expected to anticipate the creation of the new office and to shape budgets accordingly.

These reasons demonstrate, beyond doubt, that the Legislature did not intend the special authority provided in sections 50 and 52 to be effective for any year after 1947. There are no compelling reasons inviting the interpretation upon which the Freeholders rely.

## D. *The Local Budget Law*

The Board of Freeholders, based upon its theory that a transfer of appropriations to the Superintendent was automatic, also took the position that no compliance with the Local Budget Law was necessary with respect to such transfer. That position is not correct.

The Board of Freeholders adopted its 1984 budget, including an appropriation for the Board of Elections, on February 15, 1984. The appropriations contained in that budget can be changed only in accordance with the following provisions of the Local Budget Law:

*N.J.S.A.* 40A:4–46:

A local unit may make emergency appropriations, after the adoption of a budget, for a purpose which is not foreseen at the time of the adoption thereof, or for which adequate provision was not made therein. Such an appropriation

shall be made to meet a pressing need for public expenditure to protect or promote the public health, safety, morals or welfare or to provide temporary housing or public assistance prior to the next succeeding fiscal year.

*N.J.S.A.* 40A:4–85:

The director may, at the request of the governing body, make such correction of the title, test or amount of any item of appropriation appearing in the adopted budget only as shall be necessary to make said item of appropriation available for the specific purpose or purposes required by the local unit. To this end, the director may limit or approve adjustment of items of appropriations, but no item of appropriation required for debt service, contingent expenses, deferred charges, statutory expenditures, judgments or reserves shall be so reduced or limited.

*N.J.S.A.* 40A:4–57:

No officer, board, body or commission shall, during any fiscal year, expend any money (except to pay notes, bonds, or interest thereon), incur any liability, or enter into any contract which by its terms involves the expenditure of money for any purpose for which no appropriation is provided, or in excess of the amount appropriated for such purpose.

Any contract made in violation thereof shall be null and void, and no money shall be paid thereon.

*N.J.S.A.* 40A:4–58 allows transfers between appropriations for purposes specified in the budget, but only during November and December, the last two months of the fiscal year; however, no transfers may be made to appropriations for contingent expenses or deferred charges. Finally, *N.J.S.A.* 40A:4–32(a) requires the budget to set forth separate items of appropriation for at least: "administration, operation, and maintenance of each office, department, institution, or other agency of the local unit." The Office of Superintendent Elections and the Board of Elections are separate offices of the county.

▇▇▇▇ The Local Budget Law is designed to promote sound business practices, the avoidance of ill-considered expenditures and the opportunity for the public to have a better understanding of and a better access to the financial affairs of the county. *Kotlikoff v. Tp. of Pennsauken,* 131 *N.J.Super.* 590, 595 (Law.Div.1974). When the Board of Freeholders created the Office of Superintendent of Elections and appointed John Sacca as the Superintendent, it also agreed to pay him a salary of $23,750. This is a "liability" as well as a "contract," both of which are prohibited by *N.J.S.A.* 40A:4–57 since no appropria-

tion was made for that salary. Furthermore, when the Board of Freeholders transferred *all* of the employees' furnishings, equipment, files, supplies, and space from the Board of Elections to the Superintendent, it created an additional "liability" because of its obligation to supply the needs of the Board of Elections, needs which would have to be paid from other sources after that transfer became effective. The transfer, in effect, also changed the "title, text or amount" of an item of appropriation which appeared in the adopted budget. The title to most of the appropriation for the Board of Elections was changed to Superintendent of Elections and the amount of the Board's appropriation was transferred to that new office. This can only be *requested* by the Board of Freeholders; it can be accomplished only by the Director of the Division of Local Finance in the Department of Community Affairs pursuant to *N.J.S.A.* 40A:4–85. Furthermore, it is not proper for the county to incur a new liability, such as that created when the Superintendent's office was established, with the understanding that it will be covered by a transfer permitted by the Local Budget Law in November. *State v. Boncelet,* 107 *N.J.Super.* 444, 450 (App.Div.1969).

*Conclusion*

The restraints imposed upon the Superintendent of Elections in this matter shall continue until the Board of Freeholders has made provision for satisfying the needs of the Superintendent of Elections and the Board of Elections and until there has been compliance with the requirements of the Local Budget Law.[3]

---

[3]Shortly prior to the release of this opinion, the Public Advocate filed two reports setting forth the position of the Board of Elections on the allocation of resources. The reports were the product of wide-ranging inquiries, valuable consultations and numerous meetings with the disputants. They were accepted by all parties. As a result, much expensive, time-consuming litigation was avoided.